**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0967-22

MICHAEL SKELLY,

    Plaintiff-Appellant,

v.

HACKENSACK UNIVERSITY
MEDICAL CENTER NORTH AT
PASCACK VALLEY, LLC,

    Defendant-Respondent.

_____

Submitted December 4, 2023 – December 19, 2023

Before Judges Marczyk and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4618-20.

Filosa Graff LLP, attorneys for appellant (Gregory N. Filosa, on the briefs).

Wilentz, Goldman & Spitzer PA, attorneys for respondent (Darren Michael Gelber, of counsel and on the brief).

PER CURIAM

Dr. Michael Skelly appeals an order granting Pascack Valley Hospital, LLC ("PVH")[1] summary judgment in a matter concerning PVH's decision to delay Dr. Skelly's application privileges at their hospital while they fully examined his prior termination from another facility. Dr. Skelly claims that by this delay, PVH intentionally and maliciously interfered with his prospective employment offer and his expectation of an economic advantage, which was dependent on his having privileges at PVH. Having reviewed the record de novo, we affirm.

I.

Dr. Skelly was employed by the Physician Affiliate Group of New York ("PAGNY"), an entity which assigns doctors to hospital positions at the New York City Health and Hospitals Corporation ("HHC") facilities. HHC contracted with PAGNY to staff the Lincoln Medical Center ("LMC") with physicians. From 2002 to 2015, PAGNY assigned Dr. Skelly as an attending physician in the Department of Infectious Diseases at LMC. PAGNY not only disbursed Dr. Skelly's salary but also provided him with employment benefits.

---

[1] According to respondent, the correct name under which they should have been pleaded is Pascack Valley Hospital, LLC.

A-0967-22

In August 2015, Dr. Skelly was treating individuals at LMC affected by a Legionnaires' disease outbreak. Without the authorization or supervision of HHC, LMC, or PAGNY, Dr. Skelly initiated visits to patients' homes, seeking permission to test their drinking water for the bacteria linked to the disease. Upon learning of Dr. Skelly's actions, HHC placed him on administrative leave for violating HIPAA.[2] HHC also urged PAGNY to terminate Dr. Skelly's employment. PAGNY then terminated Dr. Skelly for "gross misconduct," ending his employment at LMC. Subsequently, Dr. Skelly filed suit against HHC and PAGNY, alleging his termination violated New York's whistleblower protection law, N.Y. Lab. Law § 741.

In September 2018, Dr. Skelly sought employment as an infectious disease physician at Sylvan Infectious Diseases ("Sylvan") and accepted an employment contract offered by Dr. Pan Ko. This agreement was contingent on Dr. Skelly obtaining privileges to work at three hospitals, including PVH.

In October 2018, Dr. Skelly submitted his application for privileges to PVH. PVH required Dr. Skelly to produce complete and accurate information that established he was deserving of privileges to work there. The "Attestations"

_____

[2] The Health Insurance Portability and Accountability Act (HIPAA) has many important purposes, one of them being the protection and privacy of health information. Michelson v. Wyatt, 379 N.J. Super. 611, 622 (App. Div. 2005).

section of the application asked, "Have you ever been denied employment, appointment, clinical privileges or renewal thereof, or been subject to disciplinary action by any hospital/healthcare facility medical/professional staff?" Dr. Skelly answered, "No." It also asked, "Have there ever been, or are there currently pending challenges to or disciplinary actions initiated against any membership on any hospital/healthcare facility medical/professional staff?" to which Dr. Skelly also answered, "No."

The application also required Dr. Skelly to list his work history, which he completed by listing each hospital where he worked throughout his career, including LMC. Dr. Skelly characterized his departure from LMC as "contract termination." He did not disclose his prior employment or affiliation with PAGNY, his termination for cause by PAGNY, or that HHC requested his removal from the roster of PAGNY physicians who could treat patients at HHC facilities.

At PVH, such applications are processed by hospital staff and then reviewed and considered by the hospital's credentials committee. PVH staff began processing the application in their usual course by requesting employment verification from the entities and individuals listed therein.

4

Dr. Skelly's omission of his PAGNY employment impeded the credentials committee's verification process because they had been communicating with LMC rather than PAGNY. Eventually, the credentialing committee learned that Dr. Skelly's employment terminated in 2015 as the result of a disciplinary matter.

In March and April 2019, the committee deferred Dr. Skelly's application, citing his omission and the absence of employment verification. In May, after obtaining all the requisite information, the credentials committee indefinitely tabled his application, stating he was "not a good fit culturally with the [h]ospital and its staff." Shortly thereafter, Dr. Ko terminated the employment contract with Dr. Skelly for failure to secure credentials at PVH.

In June 2019, the credentials committee reviewed new information that they had previously requested from PAGNY, and recommended PVH's Chief Medical Officer ("CMO") reach out to Dr. Skelly regarding his application. The credentials committee asked the CMO to inquire whether Dr. Skelly would consider withdrawing his application for privileges because, if denied, PVH would be obligated to report the denial to the National Practitioner Data Bank ("NPDB"), a repository of reports containing information on medical malpractice payments and certain adverse actions related to healthcare

5

practitioners, providers, and suppliers. The CMO approached Dr. Skelly, who expressed his desire to continue with the application process.

In July, the credentials committee unanimously voted to deny Dr. Skelly's application, recommending forwarding the denial to PVH's medical executive committee and legal department for final review. In August, the legal department recommended a one-year staff appointment for Dr. Skelly, which was first approved by the credentials committee and then the PVH medical executive committee. However, Dr. Ko had already filled the position at Sylvan,, which negated the benefit of the conferred privileges at PVH to Dr. Skelly.

Dr. Skelly filed a complaint against PVH stating two causes of action: (1) tortious interference with prospective economic advantage and (2) tortious interference with contract. After discovery, PVH moved for summary judgment. On October 28, 2022, the trial court entered an order granting PVH's motion dismissing Dr. Skelly's claims.

The trial court held PVH had a legitimate reason to delay Dr. Skelly's credentialing process, and Dr. Skelly failed to present any evidence establishing PVH's intent to interfere with his employment contract with Sylvan. In reaching this conclusion, the judge explained:

Plaintiff admits potentially significant enough grounds to delay or deny these credentials.

The credentialing committee tables plaintiff's credentialing process indefinitely because plaintiff was not a good cultural fit.

[I]t is plausible that the reason was because of the circumstances surrounding plaintiff's prior termination.

. . . .

Here, plaintiff asserts the reasons for his credentialing delay are in dispute. But there is no evidence that defendant's behavior was intended to interfere with plaintiff's contract with Sylvan.

Whether the delay was in fact caused by the lack of proper employment verification or the circumstances of plaintiff's prior termination, plaintiff cannot sustain his claim without evidence that the credentialing delay was intended to interfere with plaintiff's contract with Sylvan.

Plaintiff, essentially, argues that because all of the necessary information and verifications were provided by [LMV], there was no reason to delay plaintiff's credentialing process except to interfere with his contract with Sylvan.

However, defendants considered the circumstances of plaintiff's prior termination, as well.

Thus, there was legitimate reason to delay plaintiff's credentialing process, and, in any event, there is no evidence to show that defendant intended to interfere with plaintiff's contract with Sylvan.

7

Therefore, plaintiff's claim fails and summary judgment must be granted to the defendant.

## II.

We review a trial court's grant of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022); Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 655 (2022); Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Friedman v. Martinez, 242 N.J. 449, 471-72 (2020) (quoting R. 4:46-2(c)). However, if the evidence is conflicting and there are material facts in dispute that a rational jury could resolve in favor of the non-moving party, the motion must be denied. Mangual v. Berezinsky, 428 N.J. Super. 299, 308-09 (App. Div. 2012). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (citing Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986))). All reasonable inferences must

8

be resolved in favor of the party opposing summary judgment. Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012).

### III.

On appeal, Dr. Skelly contends the trial court failed to properly weigh the evidence by resolving inferences in favor of PVH. This resulted in the court wrongly concluding the hospital's employees did not act intentionally and maliciously.

To establish a claim for tortious interference with a prospective economic advantage, a "plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendant['s] malicious interference, and that it suffered losses thereby." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 305-06 (2001) (citation omitted). For tortious interference with a contract a plaintiff must prove: (1) an existing contract or reasonable expectation of economic advantage; (2) intentional and malicious interference with that relationship; (3) the loss of the contract or prospective gain as a result of the interference (causation); and (4) damages resulting from that interference. Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 49 (App. Div. 1997) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 752 (1989)). "Whether the tort is denominated as an intentional

interference with contractual advantage, or future economic advantage, the import is the same." Jenkins v. Region Nine Hous. Corp., 306 N.J. Super. 258, 265 (App. Div. 1997). "[I]n any action based on tortious interference . . . [the] interference [must] be malicious." Kopp, Inc. v. United Techs., 223 N.J. Super. 548, 559 (App. Div. 1988). Although these torts are separate causes of action, both have as their focus the means of interference. Nostrame v. Santiago, 213 N.J. 109, 121-22 (2013).

It is undisputed Dr. Skelly had a reasonable expectation of an economic advantage in the signed employment agreement with Sylvan, that PVH had knowledge of that expectation at the time the credentialing process began, and that Dr. Skelly had damages. Thus, the only issue before the motion court involved whether PVH intentionally inflicted harm on Dr. Skelly without justification.

Dr. Skelly argues PVH's repeated tabling, then denial, and ultimate limited approval of his application constituted intentional and malicious interference with his employment agreement with Sylvan. He argues PVH's delay and denial satisfied the intentional element for tortious interference because PVH knew or should have known that the delay in considering the application was likely to interfere with Dr. Skelly's potential employment with Sylvan. Dr. Skelly further

contends PVH's delay and denial was malicious because PVH did so intentionally and without justification or excuse. He posits that because PVH had all the necessary information at their May 2019 meeting, denying his privileges only to approve them months later and asking him to withdraw his application showed malice. PVH claims any delay resulted from Dr. Skelly's omissions and inaccuracies on his application and their actions were reasonable and not intentional or malicious.

"Interference with a contract is intentional 'if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003) (quoting Restatement (Second) Torts § 766A, cmt. e (Am. L. Inst. 1977)). "[A]n intentional wrong can be shown not only by proving a subjective desire to injure, but also by a showing, based on all the facts and circumstances of the case, that the employer knew an injury was substantially certain to result." Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 614 (2002).

"[T]he term malice is not used in the literal sense requiring ill will toward the plaintiff," instead, "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart-Morristown, 116 N.J. at 751 (citing Restatement (Second) of Torts ch. 37, § Scope, intro.

11

note (Am. L. Inst. 1979)); <u>Dimaria Const., Inc. v. Interarch</u>, 351 N.J. Super. 558, 567 (App. Div. 2001) ("[M]alice is defined to mean that the interference was inflicted intentionally and without justification or excuse."); <u>see also</u> <u>Russo</u>, 358 N.J. Super. at 269. Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented. <u>Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.</u>, 282 N.J. Super. 140, 199 (App. Div. 1995).

IV.

Guided by these principles of law, we conclude that even when viewing the facts in the light most favorable to Dr. Skelly, the record lacks competent evidence that PVH intentionally or maliciously inflicted harm by delaying their approval process. Thus, we are not persuaded the judge erred in finding no genuine issues of material fact from which a jury could conclude he established a prima facie case of tortious interference.

The delays in the processing of Dr. Skelly's application were solely attributable to his failure to provide accurate and complete information and by the delays in receiving necessary employment verifications from other parties. Without full and accurate information, PVH was unable to move through the full

12

credentialing review process in an expeditious manner, which ultimately led to Dr. Skelly's lost employment opportunity.

PVH was justifiably concerned with Dr. Skelly's failure to include his work for PAGNY, the vital information related to his termination from PAGNY and LMC, and for conducting unauthorized independent research. The credentials committee was further concerned Dr. Skelly was willing to risk violating HIPAA laws to satisfy his own agenda. They believed such a risk was not worth damaging the work culture of the hospital.

Dr. Skelly's argument that PVH acted with intent to interfere with his contract of employment was not supported by any evidence and was based on his own opinions. Subjective beliefs or opinions simply do not qualify as competent evidence sufficient to defeat a summary judgment motion. See Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999). Indeed, "[a]n opponent to a summary judgment motion cannot defeat the motion by raising a misguided subjective belief . . . to create the existence of a genuine issue of material fact." Optopics Labs. Corp. v. Sherman Labs., Inc., 261 N.J. Super. 536, 544 (App. Div.1993) (quoting Swarts v. Sherwin-Williams Co., 244 N.J. Super. 170, 178 (App. Div. 1990)).

A-0967-22

Once PVH had all the necessary information, the credentials committee determined the risks of adding Dr. Skelly to their roster of credentialed physicians outweighed the benefits. This decision was reviewed by their executive committee and legal department in due course, and a one-year period was eventually approved. Nothing in the record indicates PVH had any motive or intent in delaying and later denying Dr. Skelly's application for any reason other than to collect all the information regarding Dr. Skelly's previous employment before making a final decision.

Regarding Dr. Skelly's claims of a threat by PVH to report his denial of privileges to the NPDB, the NPDB requires hospitals to report certain adverse clinical privileges actions related to professional competence and conduct of physicians. Actions taken against a physician's clinical privileges include reducing, restricting, suspending, revoking, or denying privileges. PVH's offer to Dr. Skelly to voluntarily withdraw his application was an attempt to avoid a potential official report to the NPDB, which could have remained on Dr. Skelly's record indefinitely. It was not an attempt to interfere with Dr. Skelly's job opportunity, because Sylvan had already hired another candidate.

In Singer v. Beach Trading Co., Inc., 379 N.J. Super. 63, 82 (App. Div. 2005), we affirmed the grant of summary judgment in favor of an employer who

14

provided false information to a subsequent employer, finding that there was "no evidence that [the former employer] intended to induce or cause [the new employer] to terminate plaintiff's employment by giving false information." If there is no liability for providing false information to a subsequent employer, certainly there can be no liability against a hospital who expends the reasonable and necessary time and effort to process the application for hospital privileges of a physician who provided inaccurate and incomplete information.

To the extent we have not specifically discussed any remaining arguments raised by Dr. Skelly, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-0967-22